**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| GREGG T. CARDIN, individually, and on behalf of all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 1:21-cv-03350 |
| v. | ) ) ) | Jury Trial Demanded |
| NEWREZ LLC d/b/a SHELLPOINT MORTGAGE SERVICING, | ) ) ) | |
| Defendant. | | |

**FIRST AMENDED CLASS ACTION COMPLAINT**

**NOW COMES** GREGG T. CARDIN ("Plaintiff"), individually, and behalf of all others

similarly situated, by and through his undersigned counsel, complaining of NEWREZ LLC d/b/a

SHELLPOINT MORTGAGE SERVICING ("Shellpoint"), as follows:

**NATURE OF THE ACTION**

1.      Plaintiff brings this action seeking redress for Shellpoint's breach of contract,

violations of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. §1692 *et seq.,*

violations of the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815

ILCS 505/1 *et seq.*, and unjust enrichment.

2.      Plaintiff's claims arise from Shellpoint's unlawful assessment of charges to

Plaintiff's mortgage loan. Specifically, Shellpoint unilaterally purchased and charged Plaintiff for

a property insurance policy despite having actual knowledge that Plaintiff maintained his own

property insurance policy. Despite Plaintiff's repeated disputes of the erroneous insurance charges,

Shellpoint refused to reverse the charges it unfairly assessed to Plaintiff's mortgage loan. As a

result of Shellpoint's conduct, Plaintiff's mortgage loan fell into default status and Plaintiff was forced to pay for the erroneous charges assessed by Shellpoint to bring his loan current.

3.     Upon information and belief, Shellpoint's conduct in unilaterally purchasing a property insurance policy despite having actual knowledge that a borrower maintains his/her own policy is a widespread practice that has injured hundreds, if not thousands, of consumers in Illinois.

4.     Specifically, the insurance policies unilaterally purchased by Shellpoint are significantly more expensive than the insurance policies that are independently maintained by consumers, including Plaintiff.

5.     Upon information and belief, Shellpoint receives kickbacks from the insurer that issues the insurance policies that Shellpoint unilaterally purchases on behalf of consumers without a valid basis. Accordingly, Shellpoint profits from its scheme and the scheme results in significant monetary loss to Illinois consumers as consumers are forced to pay for more expensive insurance policies to bring their mortgage loans current.

## JURISDICTION AND VENUE

6.     Subject matter jurisdiction is conferred upon this Court pursuant to 28 U.S.C. §§1331 and 1337 as the action arises under the laws of the United States.

7.     The Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. §1367.

8.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b)(2) because all of the events or omissions giving rise to the claims occurred within this judicial district.

## PARTIES

9.     Plaintiff is a natural person, over 18-years-of-age, who once owned a property located at 1550 S. Blue Island Ave, Unit 810, Chicago, IL 60608 ("subject property").

10.     Shellpoint is a prominent mortgage servicer that services mortgage loans nationwide, including mortgage loans issued to Illinois consumers.

11.     Shellpoint does business in Illinois and maintains a registered agent in Illinois.

## FACTUAL ALLEGATIONS

12.     In 2007, Plaintiff obtained a first mortgage loan from America's Wholesale Lender ("AWL"), secured by the subject property.

13.     At the time Plaintiff purchased the subject property, the property served as Plaintiff's principal residence.

14.     In 2014, Plaintiff refinanced his mortgage loan with Quicken Loans ("subject loan").

15.     Pursuant to the terms of the subject loan, Plaintiff was obligated to make monthly in the approximate amount of $1,205.00 for 30 years.

16.     The subject loan was an escrowed loan, therefore requiring Plaintiff to make real estate tax payments through an escrow account.

17.     Pursuant to the terms of the subject loan, Plaintiff was required to maintain property insurance for the subject property.

18.     At all times relevant, Plaintiff maintained his own property insurance policy for the subject property.

19.     Shortly after the refinance, Ditech Financial LLC ("Ditech") became the servicer of the subject loan.

20.     Plaintiff did not have any issues with the subject loan while Ditech serviced the subject loan.

21.     In November 2019, Shellpoint acquired and/or began servicing the subject loan.

22.     At the time Shellpoint began servicing the subject loan, Plaintiff's mortgage payment was $1,205.23 (principal, interest, and escrow for real estate taxes).

23.     At the time Shellpoint acquired and/or began servicing the subject loan, Plaintiff was contractually current on the payments on the subject loan.

24.     At the time Shellpoint began servicing the subject loan, Plaintiff maintained his own property insurance policy on the subject property.

25.     At the time Shellpoint began servicing the subject loan, Shellpoint's records indicated that the subject loan was in default and Shellpoint treated it as such.

26.     Specifically, on November 12, 2019, Shellpoint sent a correspondence to Plaintiff notifying Plaintiff that Shellpoint was his new mortgage servicer. The correspondence (1) erroneously alleged that the subject loan had a negative escrow balance of $1,487.72 ("escrow shortage") and (2) explicitly stated that Shellpoint is a "debt collector" and that the correspondence was "an attempt to collect a debt and any information will be used for that purpose."

27.     Plaintiff's escrow account could not have been underfunded as Plaintiff was current on his mortgage payments. Moreover, Plaintiff had not been notified of any escrow shortage until Shellpoint began servicing the subject loan.

28.     Also in November 2019, Shellpoint sent Plaintiff a mortgage statement that alleged that the subject loan was in default.

29.     Specifically, the mortgage statement indicated that an "overdue payment" fee of $25.00 was owed by Plaintiff. Accordingly, Shellpoint demanded a payment of $1,230.23 instead of Plaintiff's regular monthly payment of $1,205.23.

30.     Moreover, the statement falsely alleged that the subject loan had an escrow shortage of $1,380.56.

4

31.     The November 2019 mortgage statement was the very first mortgage statement sent by Shellpoint to Plaintiff after Shellpoint began servicing the subject loan. The statement explicitly stated that Shellpoint is "a debt collector" and that Shellpoint was attempting "to collect a debt and any information obtained will be used for that purpose."

32.     In January 2020, Shellpoint began sending Plaintiff correspondences requesting proof that Plaintiff maintained property insurance on the subject property.

33.     In response to the correspondences, Plaintiff promptly and repeatedly provided Shellpoint with proof that he maintained an active property insurance policy on the subject property. Specifically, Plaintiff first provided Shellpoint with proof of insurance in January 2020.

34.     From December 2019 through February 2020, Shellpoint sent Plaintiff mortgage statements that falsely alleged (1) an "overdue payment" fee of $25.00 and (2) an escrow shortage ranging from $1,166.24 to $1,380.56.

35.     Plaintiff timely made all mortgage payments in the amount of $1,205.23 that became due from December 2019 through February 2020.

36.     In March 2020, Shellpoint sent Plaintiff a mortgage statement that falsely alleged (1) an "overdue payment" fee of $25.00 and (2) an escrow shortage of **$2,938.17**.

37.     In early April 2020, Shellpoint sent Plaintiff a mortgage statement that stated an "Amount Due" of $2,169.04, consisting of $347.59 for principal, $750.48 for interest, and **$1,045.97 for escrow**. The statement further alleged an escrow shortage of **$3,637.18** and indicated that Shellpoint charged the subject loan $806.17 for "Lender Placed Hazard" insurance ("forced-placed insurance").[1]

---

[1] Forced-placed insurance takes place when a mortgage company purchases property insurance on behalf of the borrower and charges the cost of the insurance to the loan. A mortgage company is required to provide a borrower with notice of its intent to purchase the property insurance and provide a borrower with time to purchase his/her own policy or provide proof of an existing policy.

38.     At the time Shellpoint forced-placed insurance, Shellpoint had actual knowledge that Plaintiff maintained his own insurance policy.

39.     The forced-placed insurance caused Plaintiff's mortgage payment to nearly double from $1,205.23 to $2,144.04. Specifically, the forced-placed insurance caused Plaintiff's monthly escrow payment to increase from approximately $107 per month to $1,045.97 per month.

40.     On April 14, 2020, Plaintiff sent a written correspondence to Shellpoint (to an address that Shellpoint requested that Plaintiff send the correspondence to) again notifying Shellpoint that he independently maintained a homeowner's insurance policy and again providing Shellpoint with a copy of the insurance policy.

41.     At the time Shellpoint forced-placed insurance, Plaintiff was in the process of selling the subject property. Accordingly, the erroneous charges assessed by Shellpoint for the forced-placed insurance caused the loan payoff to increase.

42.     In May 2020, Shellpoint sent Plaintiff a mortgage statement seeking to collect an inflated monthly mortgage payment of $2,144.04. Moreover, the statement indicated that Shellpoint charged the subject loan an *additional* $160.69 for forced-placed insurance and alleged an escrow shortage of $3,797.87.

43.     On May 22, 2020, Plaintiff sent another written correspondence to Shellpoint (to an address that Shellpoint requested that Plaintiff send the correspondence to) again notifying Shellpoint that he independently maintained a homeowner's insurance policy and again providing Shellpoint with a copy of the insurance policy.

44.     In June 2020, Shellpoint sent Plaintiff a mortgage statement seeking to collect an inflated monthly mortgage payment of $2,144.04. Moreover, the statement indicated that

Shellpoint charged the subject loan an *additional* $524.23 for forced-placed insurance and alleged an escrow shortage of $2,230.16.

45.     In July 2020, Shellpoint sent Plaintiff a mortgage statement seeking to collect an inflated monthly mortgage payment of $2,169.04. Moreover, the statement indicated that Shellpoint charged the subject loan an *additional* $517.07 for forced-placed insurance and alleged an escrow shortage of $1,701.26.

46.     On July 20, 2020, Plaintiff sent another written correspondence to Shellpoint (to an address that Shellpoint requested that Plaintiff send the correspondence to) again notifying Shellpoint that he independently maintained a homeowner's insurance policy and again providing Shellpoint with a copy of the insurance policy.

47.     Between May 2020 and July 2020, Plaintiff repeatedly disputed the forced-placed insurance charges that Shellpoint assessed to the subject loan via written correspondences and phone calls. Despite Plaintiff's repeated disputes of the erroneous charges, Shellpoint failed to reverse the charges despite having a reasonable time period to do so.

48.     In response to Plaintiff's disputes, Shellpoint advised Plaintiff that he would be receiving a refund for the forced-placed insurance charges once the proof of insurance he submitted is "processed" by Shellpoint.

49.     Based on Shellpoint's representations that he would be receiving a refund for the forced-placed insurance charges and under mounting pressure to complete the pending sale of the subject property, Plaintiff reluctantly paid the inflated amounts sought in the May, June, and July 2020 mortgage statements.

50.     In July 2020, Shellpoint sent Plaintiff a mortgage statement seeking to collect an inflated monthly mortgage payment of $2,169.04. Moreover, the statement indicated that

Shellpoint charged the subject loan an *additional* $517.07 for forced-placed insurance and alleged an escrow shortage of $1,701.26.

51.     On July 21, 2020, the closing for the sale of the subject property took place. During the closing, Plaintiff remitted the payoff amount requested by Shellpoint to Shellpoint via wire and tendered the keys to the subject property to the purchaser.

52.     Approximately one week after Plaintiff remitted the loan payoff to Shellpoint, Shellpoint returned the funds on the basis that the payoff was short approximately $1,200 as a result of real estate taxes paid by Shellpoint on behalf of Plaintiff. Shellpoint's contention that the loan payoff was short was false because Shellpoint's payoff letter explicitly included the real estate taxes that it was now claiming was the basis for the shortfall.

53.     Accordingly, the sale of the subject property was not formally completed.

54.     In August 2020, at least four weeks *after* the July closing, Shellpoint sent Plaintiff a mortgage statement demanding payment of $4,367.98 to bring the subject loan current. Moreover, the statement indicated that Shellpoint charged the subject loan an *additional* $545.62 on July 30, 2020 (after the closing) for forced-placed insurance and alleged an escrow shortage of $3,843.09.

55.     In September 2020, months *after* the July closing, Shellpoint sent Plaintiff a mortgage statement demanding payment of $6,566.92 to bring the subject loan current. Moreover, the statement indicated that Shellpoint charged the subject loan an *additional* $524.23 on September 1, 2020 for forced-placed insurance and alleged an escrow shortage of $4,367.31.

56.     After the July 2020 closing and after Plaintiff relinquished possession of the subject property to the buyer, Shellpoint demanded an additional $4,297.66 from Plaintiff to cover accrued interest on the subject loan. Shellpoint's demand for an additional $4,297.66 to cover accrued

8

interest was blatantly erroneous as the monthly interest on the subject loan at the time was approximately $750.00 per month.

57.     Under duress to formally complete the sale of the subject property, Plaintiff paid the alleged outstanding interest.

58.     All the mortgage statements sent by Shellpoint to Plaintiff explicitly stated that Shellpoint is "a debt collector" and that Shellpoint was attempting "to collect a debt and any information obtained will be used for that purpose."

59.     In total, Shellpoint deceptively collected from Plaintiff a total of $3,078.01 for forced-placed insurance and at least $2,000 in accrued interest that it was not entitled to.

60.     Moreover, in late 2020, Plaintiff discovered that Shellpoint falsely reported to the credit bureaus that Plaintiff was more than 30 days late on his mortgage payments for May 2020, August 2020 (after the sale of the subject property), and September 2020 (after the sale of the subject property).

61.     Upon information and belief, Shellpoint receives kickbacks from the insurer that issued the insurance policy that Shellpoint unilaterally purchased on behalf of Plaintiff without Plaintiff's consent or authorization.

62.     Accordingly, Shellpoint profited from the purchase of the insurance policy to the detriment of Plaintiff.

63.     Upon information and belief, Shellpoint's conduct in unilaterally purchasing a property insurance policy despite having actual knowledge that a borrower maintains his/her own policy is a widespread practice that has injured hundreds, if not thousands, of consumers in Illinois.

64.     Upon information and belief, Shellpoint's forced-placed insurance scheme has resulted in massive profits to Shellpoint at the expense of vulnerable consumers.

## DAMAGES

65.     As a result of Shellpoint's unfair and deceptive conduct, Plaintiff was significantly harmed.

66.     Specifically, Plaintiff suffered financial losses in the amount of at least $5,078.00: (1) $3,078.01 in losses for the forced-placed insurance that was unilaterally purchased by Shellpoint and unfairly charged to Plaintiff and (2) at least $2,000 in losses for the inflated accrued interest that was improperly collected by Shellpoint.

67.     In addition to financial losses, Plaintiff suffered emotional distress and mental anguish as a result of Shellpoint's conduct. Specifically, the delays in the completion of the sale of the subject property due to Shellpoint's assessment of erroneous charges put immense stress on Plaintiff due to the risk of the sale falling through. The stress caused by the uncertainty impacted Plaintiff's general well-being and adversely affected Plaintiff's quality of life.

68.     Moreover, Plaintiff lost significant time addressing Shellpoint's erroneous charges and repeated requests for additional funds that it was not entitled to. In total, Plaintiff wasted no less than 60 hours dealing with the erroneous charges assessed by Shellpoint. As set forth above, Plaintiff repeatedly disputed the erroneous charges with Shellpoint, only to be falsely assured by Shellpoint that he would be receiving a refund for the forced-placed insurance.

69.     As of the date of the filing of the original complaint, Plaintiff has not received a refund from Shellpoint for the erroneous forced-placed insurance charges that were assessed and collected by Shellpoint.[2]

70.     Lastly, Shellpoint's false credit reporting to the credit bureaus destroyed Plaintiff's credit score and credit worthiness. As set forth above, Shellpoint falsely reported that the subject

---

[2] Shellpoint finally issued a refund to Plaintiff in July 2021.

loan was more than 30 days past due for months *after* the July 2020 closing. Shellpoint's false credit reporting caused Plaintiff significant damages, including the loss of credit opportunity and higher interest rates on loans/credit.

## CLASS ALLEGATIONS

71.     All paragraphs of this Complaint are expressly adopted and incorporated herein as though fully set forth herein.

72.     Plaintiff brings this action pursuant to Fed. R. Civ. P. 23(b)(2) and 23(b)(3) individually, and on behalf of all others similarly situated ("Putative Class"). The Putative Class is defined as follows:

> All individuals in the State of Illinois (1) who have/had a mortgage loan serviced by Shellpoint; (2) in which Shellpoint purchased a property insurance policy; (3) and charged the costs of the property insurance policy to the individual's mortgage loan; (4) after the individual submitted proof of insurance to Shellpoint; (5) within the three years preceding the date of the original complaint through the date of class certification.

73.     The following individuals are excluded from the Putative Class: (1) any Judge or Magistrate Judge presiding over this action and members of their families; (2) Shellpoint, Shellpoint's subsidiaries, parents, successors, predecessors, and any entity in which Shellpoint or its parents have a controlling interest and their current or former employees, officers and directors; (3) Plaintiff's attorneys; (4) individuals who properly execute and file a timely request for exclusion from the Putative Class; (5) the legal representatives, successors or assigns of any such excluded individuals; and (6) individuals whose claims against Shellpoint have been fully and finally adjudicated and/or released.

### A.     Numerosity

74.     Upon information and belief, the members of the Putative Class are so numerous that joinder of them is impracticable.

75.     The exact number of the members of the Putative Class is unknown to Plaintiff at this time and will be determined through discovery.

76.     The members of the Putative Class are ascertainable because the Class is defined by reference to objective criteria.

77.     The members of the Putative Class are identifiable in that their names, addresses, and telephone numbers can be identified in business records maintained by Shellpoint.

**B.      Commonality and Predominance**

78.     There are many questions of law and fact common to the claims of Plaintiff and the Putative Class, including whether Shellpoint's conduct in unilaterally purchasing insurance policies and assessing charges to mortgage loans for the insurance policies despite having actual knowledge that the borrowers maintain their own policies violates the ICFA.

79.     Those questions predominate over any questions that may affect individual members of the Putative Class.

**C.      Typicality**

80.     Plaintiff's claims are typical of members of the Putative Class because Plaintiff and members of the Putative Class are entitled to damages as a result of Shellpoint's conduct.

**D.      Superiority and Manageability**

81.     This case is also appropriate for class certification as class proceedings are superior to all other available methods for the efficient and fair adjudication of this controversy.

82.     The damages suffered by the individual members of the Putative Class will likely be relatively small, especially given the burden and expense required for individual prosecution.

83.     By contrast, a class action provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

84.    Economies of effort, expense, and time will be fostered and uniformity of decisions ensured.

**E.    Adequate Representation**

85.    Plaintiff will adequately and fairly represent and protect the interests of the Putative Class.

86.    Plaintiff has no interests antagonistic to those of the Putative Class and Shellpoint has no defenses unique to Plaintiff.

87.    Plaintiff has retained competent and experienced counsel in consumer class action litigation.

**COUNT I – VIOLATIONS OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT ("ICFA")**
**(On behalf of Plaintiff and the Members of the Putative Class)**

88.    All paragraphs of this Complaint are expressly adopted and incorporated herein as though fully set forth herein.

89.    Plaintiff is a "consumer" under the ICFA because the subject loan was incurred for personal purposes as it was used to refinance a loan encumbering Plaintiff's principal residence.

90.    Shellpoint violated ICFA by employing unfair and deceptive acts and practices against Plaintiff.

91.    Shellpoint specializes in mortgage lending, servicing, and debt collection.

92.    These actions occur in the course of conduct involving trade or commerce.

93.    Section 2 of ICFA provides:

Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false, pretense, false promise, misrepresentation or the concealment, suppression, or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in section 2 of the "Uniform Deceptive Trade Practices Act",

approved August 5, 1965, in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived, or damaged thereby. In construing this section consideration shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to section 5(a) of the Federal Trade Commission Act.

### a. Unfairness and Deception

94.     Shellpoint's conduct as set forth herein objectively violates the ICFA.

95.     It was unfair and deceptive for Shellpoint to treat the subject loan in default when it was current.

96.     It was unfair and deceptive for Shellpoint to collect amounts it was not entitled to, including (1) fictitious past due amounts, (2) improper charges for forced-placed insurance, (3) inflated amounts needed to fund the escrow account, and (4) inflated accrued interest.

97.     It was unfair and deceptive for Shellpoint to:

   a. to collect amounts it was not legally entitled to;

   b. deem the subject loan in default when it was current;

   c. misapply Plaintiff's payments by holding the payments in suspense and not applying the payments per the terms of the subject loan and mortgage;

   d. provide Plaintiff with inflated payoff figures;

   e. falsely represent to Plaintiff that it would refund the charges for the forced-placed insurance policy when Shellpoint had no intention of issuing a refund. As set forth above, Plaintiff paid the erroneous charges based on Shellpoint's false representation that it would be issuing a refund to Plaintiff;

   f. falsely report to the credit bureaus that Plaintiff is delinquent on the subject loan, including delinquent reporting for months after the July 2020 closing and after the Plaintiff no longer had possession of the subject property;

   g. fail to investigate Plaintiff's repeated disputes;

   h. fail to adequately respond to Plaintiff's repeated disputes;

   i. fail to deal with Plaintiff in good faith;

98. Plaintiff had no choice but to submit to Shellpoint's unfair and deceptive conduct as the conduct was committed in the midst of the sale of the subject property.

99. Shellpoint intended for Plaintiff to rely on its unfair and deceptive acts and Plaintiff in fact relied on the false representations by paying the fictitious and unauthorized charges assessed to the subject loan.

100. As pled above, Plaintiff was significantly harmed by Shellpoint's conduct.

101. Shellpoint's widespread scheme to defraud borrowers is driven by greed and is objectively against public policy.

102. Shellpoint's overall conduct as described herein is objectively unfair and against public policy because it results in monetary loss to consumers as their loans are unfairly driven into default and they are forced to pay for more expensive insurance policies that are unilaterally purchased by Shellpoint without a valid basis.

103. Shellpoint's conduct is against public policy because:

    a. it results in monetary loss to consumers;

    b. it is driven by greed and results in profits to Shellpoint at the consumers' expense;

    c. consumers reasonably expect their mortgage company to not unilaterally purchase and profit from unwarranted forced-placed insurance at the consumers' expense;

    d. consumers reasonably expect their mortgage company to not collect amounts it was not entitled to;

    e. consumers reasonably expect their mortgage company to not overstate the amounts owed on their loans;

    f. consumers reasonably expect their mortgage company to communicate with them truthfully regarding the status of their loans;

    g. consumers reasonably expect their mortgage company to investigate their disputes/grievances in good faith;

    h. consumers reasonably expect their mortgage company to issue refunds after making assurances that a refund is forthcoming;

    i.    consumers reasonably expect their mortgage company to accurately credit report the status of their mortgage loan;

    j.    consumers reasonably expect their mortgage company to comply with laws designed to protect consumers; and

    k.    consumers reasonably expect their mortgage company to follow state and federal law and their own guidelines.

104.    Shellpoint's conduct as described above is part of a pattern and practice in which Shellpoint routinely engages in as part of its business model.

105.    Specifically, Shellpoint has been repeatedly sued by State Attorney Generals across the United States for engaging in unfair conduct similar to the conduct complained of herein.

106.    Shellpoint mistreats consumers on a wide scale and its unlawful conduct has been publicized and condemned.

107.    Despite lawsuits filed by consumers and State Attorney Generals, Shellpoint brazenly continues to mistreat consumers nationwide.

108.    Accordingly, an award of punitive damages is appropriate because Shellpoint's conduct towards Plaintiff and the Putative Class was willful, wanton, and demonstrates a reckless disregard for the rights of Plaintiff and the Putative Class.

109.    Additionally, an award of punitive damages is appropriate to deter Shellpoint from future misconduct.

**WHEREFORE**, Plaintiff on behalf of himself and the members of the Putative Class, request the following relief:

a)    An order granting certification of the proposed class, including the designation of Plaintiff as the named representative, and the appointment of the undersigned as Class Counsel;

b)    A finding that Shellpoint violated the ICFA;

16

c) An order enjoining Shellpoint from unilaterally purchasing property insurance policies on behalf of borrowers without a valid basis to do so;

d) An award of compensatory damages to Plaintiff and members of the Putative Class;

e) An award of punitive damages to Plaintiff and members of the Putative Class;

f) An award of Plaintiff's reasonable attorney's fees and costs; and

g) Any other relief this Court deems just and proper.

## COUNT II – BREACH OF CONTRACT
### (Plaintiff Individually)

110.  All paragraphs of this Complaint are expressly adopted and incorporated herein as though fully set forth herein.

111.  The subject loan/mortgage was a valid and enforceable contract between Plaintiff and AWL and its successors and assigns ("the contract").

112.  Shellpoint is a successor and assign of the subject loan and mortgage and is therefore bound by the terms of the contract.

113.  Under Illinois law, every contract implies a covenant of good faith and fair dealing.

114.  Plaintiff performed his duties under the contract by tendering all monthly payments to Shellpoint and its predecessors and by complying with all of the other terms of the contract.

115.  Shellpoint materially breached the contract and its implied duty of good faith and fair dealing by:

a.  unilaterally purchasing a property insurance policy and charging Plaintiff the costs of the policy at a time when it had actual knowledge that Plaintiff had an active property insurance policy covering the subject property;

b.  charging the costs of the forced-placed insurance to the subject loan;

17

    c.  deeming the subject loan in default when it was current;

    d.  erroneously alleging an escrow shortage without proper notice to Plaintiff;

    e.  misapplying Plaintiff's payments by holding the payments in suspense and not timely applying the payments per the terms of the subject loan and mortgage;

    f.  charging unauthorized fees and costs ($25 overdue payment fee at a time when Plaintiff was contractually current on the subject loan);

    g.  failing to provide accurate payoff figures;

    h.  failing to investigate Plaintiff's disputes;

    i.  failing to adequately respond to Plaintiff's disputes;

    j.  failing to issue a refund to Plaintiff for the forced-place insurance charges it assessed to the loan despite repeated assurances that it would ; and

    k.  failing to deal with Plaintiff in good faith.

116.    As stated above, Shellpoint's breach of contract has caused Plaintiff significant economic and non-economic damages.

117.    Moreover, Plaintiff is entitled to punitive damages for Shellpoint's breach of contract because Shellpoint's conduct resulted in willful torts (e.g. fraud) accompanied by "wantonness" and "oppression." *See Hunter Douglas Metals, Inc. v. Edward C. Mange Trading Co.*, 586 F. Supp. 926, 929 (7th Cir. 1984) (finding that where a breach of contract contains allegations sufficient to support both a contract claim and an independent tort, both may stand and punitive damages may be awarded if plaintiff is able to sustain his burden under the tort theory.)

**WHEREFORE,** Plaintiff respectfully requests the following relief:

    a)   A finding that Shellpoint materially breached the contract;

    b)   Compensatory damages for Shellpoint's breach of contract;

c)    Punitive damages for Shellpoint's willful conduct; and

d)    Any other relief the Court deems just and proper.

## COUNT III – VIOLATIONS OF THE FAIR DEBT COLLECTION PRACTICES ACT
### (Plaintiff Individually)

118.    All paragraphs of this Complaint are expressly adopted and incorporated herein as though fully set forth herein.

119.    The subject loan is a "debt" as defined by § 1692a(5) of the FDCPA because the mortgage loan was incurred to refinance an existing loan on Plaintiff's principal residence, and thus incurred for "personal, family, or household" purposes.

120.    Shellpoint is a "debt collector" as defined by § 1692a(6) of the FDCPA because it uses instrumentalities of interstate commerce or the mails to collect debts and enforce security interests.

121.    Shellpoint is a "debt collector" as defined by § 1692a(6) of the FDCPA because its principal business purpose is the collection of debts.

122.    Shellpoint is a "debt collector" as defined by § 1692a(6) of the FDCPA because it regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another.

123.    Shellpoint is a "debt collector" because it treated the subject loan as in default as soon as it acquired and/or began servicing the subject loan.

124.    At all times relevant, Shellpoint was attempting to collect a debt allegedly owed by Plaintiff (principal, interest, past due amounts, etc.)

125.    Shellpoint's conduct as set forth herein violated 15 U.S.C. §§ 1692e, 1692e(2), 1692 e(8), 1692e(10), 1692f, and 1692f(1).

**a.    Violations of § 1692e, e(2)(A), e(8), and e(10)**

126.     Pursuant to § 1692e of the FDCPA, a debt collector is prohibited from making "any false, deceptive, or misleading representation" in connection with the collection of a debt. 15 U.S.C. § 1692e.

127.     Pursuant to § 1692e(2)(A) of the FDCPA, a debt collector is prohibited from making false representations regarding the character, amount, or legal status of any debt. 15 U.S.C. § 1692e(2)(A).

128.     Pursuant to § 1692e(8) of the FDCPA, a debt collector is prohibited from "communicating or threatening to communicate to any person credit information which is known or which should be known to be false, including the failure to communicate that a disputed debt is disputed."15 U.S.C. § 1692e(8).

129.     Pursuant to § 1692e(10) of the FDCPA, a debt collector is prohibited from using any false representation or deceptive means to collect or attempt to collect any debt. 15 U.S.C. § 1692e(5).

130.     Shellpoint violated §§ 1692e, e(2)(A), and e(10) by falsely representing to Plaintiff that the subject loan was in default when in fact that the subject loan was current. Specifically, Shellpoint continuously and falsely represented to Plaintiff that he owed a $25 "overdue payment" fee when Plaintiff was contractually current on the subject loan.

131.     Shellpoint violated §§ 1692e, e(2)(A), and e(10) by falsely and deceptively representing to Plaintiff that he owed Shellpoint for the costs of the forced-placed insurance that Shellpoint unilaterally purchased and charged to the subject loan at a time when Shellpoint had actual knowledge that Plaintiff had an active property insurance policy that covered the subject property.

132.     Shellpoint violated §§ 1692e, e(2)(A), and e(10) by misrepresenting the amount of the alleged debt owed by Plaintiff. Specifically, Shellpoint continuously inflated the amounts owed by Plaintiff on the subject loan by demanding payment on (1) fictitious past due amounts, (2) improper charges for forced-placed insurance, (3) inflated amounts needed to fund the escrow account, (4) and inflated accrued interest.

133.     Shellpoint violated §§ 1692e, e(2)(A), and e(10) by falsely and deceptively representing to Plaintiff that Shellpoint would issue a refund to Plaintiff for the costs of the forced-placed insurance in an effort to induce Plaintiff into paying the erroneous charges for the forced-placed insurance.

134.     Shellpoint violated § 1692e(8) by falsely reporting to the credit bureaus that Plaintiff was delinquent on the subject loan, including delinquent reporting for months *after* the July 2020 closing and after Plaintiff no longer had possession of the subject property.

**b.     Violations of §§ 1692f and f(1)**

135.     Pursuant to § 1692f of the FDCPA, a debt collector is prohibited from using unfair or unconscionable means to collect a debt.

136.     Pursuant to § 1692f(1) of the FDCPA, a debt collector is prohibited from collecting any amount unless such amount is expressly authorized by contract or permitted by law.

137.     Shellpoint violated § 1692f by employing unfair and unconscionable means to collect the subject loan.

138.     Shellpoint violated §§ 1692f and f(1) by collecting amounts not authorized by the terms of the subject loan or permitted by law, including (1) fictitious past due amounts, (2) improper charges for forced-placed insurance, (3) fictitious amounts needed to fund the escrow account, (4) and inflated accrued interest.

**WHEREFORE,** Plaintiff requests the following relief:

a) A finding that Shellpoint violated the FDCPA;

b) An award of actual damages;

c) An award of statutory damages;

d) An award of Plaintiff's reasonable attorney's fees and costs;

e) Any other relief this Court deems just and proper.

## COUNT IV– UNJUST ENRICHMENT

139. All paragraphs of this Complaint are expressly adopted and incorporated herein as though fully set forth herein.

140. Plaintiff brings his unjust enrichment claim as an alternative claim in the event there is no enforceable contract between Plaintiff and Shellpoint.

141. To state a claim for unjust enrichment in Illinois, "a plaintiff must allege that (1) the defendant has unjustly retained a benefit to the plaintiff's detriment, and (2) that defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience." *Horwitz v. Wells Fargo*, 2012 U.S. Dist. LEXIS 164520, at *6 (N.D. Ill. 2012).

142. Shellpoint unjustly retained a benefit to Plaintiff's detriment by deceptively collecting amounts (over $5,000) it was not entitled to, including (1) fictitious past due amounts, (2) improper charges for forced-placed insurance, (3) inflated amounts needed to fund the escrow account, and (4) inflated accrued interest.

143. Shellpoint's retention of such amounts objectively violates the fundamental principles of justice, equity, and good conscience.

**WHEREFORE**, Plaintiff requests the following relief:

a. A finding that Shellpoint has been unjustly enriched by Plaintiff;

b.  An award of compensatory damages; and

c.  Any other relief this Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury.

Dated:                                                          Respectfully Submitted,

/s/ *Mohammed O. Badwan*

Mohammed O. Badwan, Esq.
Victor T. Metroff, Esq.
Jennifer A. McLaughlin, Esq.
*Counsel for Plaintiff*
Sulaiman Law Group, Ltd.
2500 S. Highland Ave., Ste. 200
Lombard, IL 60148
Phone (630) 575-8180
mbadwan@sulaimanlaw.com
vmetroff@sulaimanlaw.com
jmclaughlin@sulaimanlaw.com